Alderman Brothers Co. *v.* Westinghouse Air Brake Co.

to him any portion of the land included in the mortgages. The plaintiff, relying on this promise, lost his right to redeem. It is apparent that the plaintiff's loss is simply the right to redeem and no more, and it appears from the allegations that this right was valuable. No such case is before the court.

On the record, it may be that the defendant, if he has obtained an unconscionable advantage, would be estopped from asserting that his title had become absolute, if it should clearly appear that the defendant had made the promise alleged, and the plaintiff had tendered the amount due on the mortgages even after the time fixed by the court for redemption had expired. The plaintiff would thus be restored to all he has lost, even if he had lost the right to redeem by relying on the defendant's promise.

There is no error.

In this opinion the other judges concurred.

---

THE ALDERMAN BROTHERS COMPANY ET ALS. *vs.* THE WESTINGHOUSE AIR BRAKE COMPANY.

Third Judicial District, New Haven, January Term, 1918.
PRENTICE, C. J., RORABACK, WHEELER, BEACH and SHUMWAY, Js.

The plaintiff sued to recover the value of an alleged deficiency of nearly 40,000 pounds in three carloads of brass turnings or chips, bought by its assignor of the defendant in Pennsylvania at the rate of 15½ cents per pound. It appeared from uncontradicted testimony that there was a considerable shortage in the metal upon its arrival in New Haven, and the material question was whether the loss should fall upon the plaintiff or upon the defendant. The transaction was an oral one, followed by a letter from the defendant to the buyer "to confirm our verbal sale to you this day of . . . our

accumulation of brass turnings (not less than 200 tons) at 15½ ¢ per lb. . . . .f. o. b. cars Wilmerding, Pa.    Terms sight draft on arrival at destination."  *Held:*—

1. That whether the letter embodied all the terms of the antecedent contract, obviously could not be determined until it was known what those terms were, and therefore the objection that parol evidence to vary the terms of the letter was inadmissible, was not well taken and should not have been sustained.

2. That testimony was properly admitted to show that the accumulation of brass turnings, in a pile by itself on the floor, was pointed out to the buyer at or before the making of the contract; and that evidence of the seller's agent as to the entire transaction was admissible, including the custom of the trade respecting the sale of scrap metal to persons without established credit, and also the real reason for using the expression "sight draft on arrival at destination."

3. That in view of the evidence before the trial court it did not err in admitting testimony as to the fact and amount of the shortage in the weight of the turnings upon their arrival in New Haven, as compared with the weight called for by the bills of lading and sight drafts; though assuming that such evidence tends to prove only a loss in transit and not a deficiency in shipment, it might or might not be admissible upon a new trial, depending upon the conclusiveness of the evidence then received as to the time the parties intended the title to the goods to pass.

Where there is a present sale or an unconditional contract to sell specific goods, in a deliverable condition, at an agreed price per pound, the title passes at once (Sales Act, § 19, Rule 1; § 22), and the risk of loss during transportation falls upon the buyer.  Under such circumstances the drawing of a bill of lading to the seller's own order reserves to himself the *jus disponendi.*

A delivery to a carrier in accordance with § 46 of the Sales Act is a delivery to the buyer within § 22, notwithstanding the fact that because of the seller's reservation of the *jus disponendi,* a right also contemplated by the Act, the buyer cannot have possession of the goods until the seller is paid.

The expression f. o. b. in a letter confirming an oral contract of sale indicates an agreement of the buyer to pay the freight from the place named.

In the present case the bills of lading, with sight drafts attached, were drawn to the defendant's own order, were indorsed by the defendant in blank and forwarded by mail to the defendant's agent.  *Held* that an instruction which placed the risk of loss during transportation upon the defendant seller, because of the form of the bills of lading, was erroneous and harmful.

Argued January 15th—decided March 12th, 1918.

ACTION to recover a portion of the purchase price paid by the plaintiff for three carloads of brass chips, because of an alleged shortage therein, brought to the Superior Court in New Haven County and tried to the jury before *Greene, J.;* verdict and judgment for the plaintiffs for $6,182, and appeal by the defendant. *Error and new trial ordered.*

The complaint alleges that the defendant sold to Jacob Svirsky of New Haven three carloads of brass chips containing 244,160 pounds, at the rate of 15½ cents per pound; that the defendant sent the three carloads of metal to New Haven and bills of lading accompanied by sight drafts; that Svirsky assigned all his right, title and interest to the plaintiff, who paid the drafts and now owns the goods; and that upon weighing the metal which reached New Haven there was found a shortage of 39,625 pounds, amounting, at 15½ cents a pound, to $6,141.87.

The answer admits and alleges that the defendant "agreed to sell" to Svirsky certain brass chips as per a verbal contract entered into between Svirsky and the defendant, "confirmed in defendant's letter to Svirsky on that day." The material part of the letter, which was signed by the defendant, but not signed by Svirsky, is as follows: "April 26th, 1916. Mr. J. Svirsky. Dear Sir. We wish to confirm our verbal sale to you this day of the following material. Our accumulation of brass turnings (not less than 200 tons) . . . at 15½ ¢ per lb. . . . All of the above prices are f. o. b. cars Wilmerding, Pa. Terms sight draft on arrival at destination."

The answer further alleges that pursuant to the contract the defendant delivered to the carrier at Wilmerding three carloads of brass chips weighing 244,160 pounds, consigned to the defendant, care of J. Svirsky, and that sight drafts accompanying the bills of lading

were sent to the defendant's agent in New Haven, "notify Mr. J. Svirsky."

The plaintiff's reply denied that the goods were delivered to the carrier "for shipment to J. Svirsky."

Upon these pleadings the parties went to trial, and the fact of a considerable shortage at New Haven being established by uncontradicted testimony, the substantial question was whether the loss should fall on the plaintiff or on the defendant. Upon this question the court charged the jury, in substance, that if the loss occurred in transit without the fault of either party, the title at the time of the loss was in the defendant, and that therefore the loss must fall upon it.

The material rulings on evidence are sufficiently stated in the opinion.

*Frederick H. Wiggin,* for the appellant (defendant).

*Benjamin Slade* and *Charles Cohen,* for the appellees (plaintiffs).

BEACH, J. One Forrester, called by the defendant, testified that he was the agent of the defendant who wrote the letter, Exhibit G, and handed it to Svirsky in defendant's factory at Wilmerding, and that he had previously, on the same day, had a conversation with Svirsky about the sale of the brass turnings referred to in Exhibit G. He was asked to state the conversation, and on objection the court ruled that parol evidence was inadmissible to vary the terms of the contract stated in Exhibit G. On the same ground parol evidence was excluded which was offered for the purpose of showing that Svirsky had no credit on defendant's books, that by the custom of the trade scrap metal, when sold to customers without established credit, was shipped "sight draft against bill of lading," and that

at Svirsky's request the phrase "sight draft on arrival at destination" was substituted for the sole purpose of extending the time of payment.

These rulings were erroneous. The letter, Exhibit G, does not purport to be a written contract, for it is not signed by both parties. It was argued that the defendant was estopped by the form of its answer from claiming that the entire contract was not embodied in the letter. That cannot be so, for both the answer and the letter refer to the contract as an antecedent verbal contract, characterized in Exhibit G as a verbal sale. Exhibit G identifies the subject-matter and states the terms of price, delivery and payment, but all this is by way of confirming the antecedent verbal sale, and until that is inquired into we cannot tell whether or not all the terms of the contract are embodied in Exhibit G.

Testimony was properly admitted to the effect that the accumulation of brass turnings was pointed out to Svirsky at or before the making of the contract, and while it lay in a pile by itself on the floor; and Forrester's testimony as to the entire transaction was admissible, including the custom of the trade and the real reason for using the phrase "sight draft on arrival at destination."

As we cannot tell what testimony may be offered at the new trial, it is desirable to point out what effect should be given, under the Sales Act, to the fact that the bills of lading were drawn to the seller's order, indorsed in blank, and forwarded to the seller's agent in New Haven with sight drafts attached.

If the verbal transaction of April 26th was a present sale or an unconditional contract to sell the whole of a specific accumulation of brass turnings, in a deliverable condition, at an agreed price per pound, then the title and risk had already passed to Svirsky before Exhibit G was written. Sales Act, § 19, Rule 1, and § 22. In

such a case the seller cannot reserve a title which has already passed to the buyer, and therefore the effect of drawing the bills of lading to the seller's order is merely to reserve the *jus disponendi*. If it should appear that the goods were sold by description or were not ascertained, the question of subsequent appropriation would come up, and under Rule 4 of § 19, a presumption of unconditional appropriation would arise from the delivery of the goods to the carrier f. o. b. at Wilmerding, subject, however, to the provisions of § 20. If it should appear that at the time of the contract something remained to be done by the seller to put the goods in a deliverable condition, the title would not pass until that was done. Section 19, Rule 2. Presumably they were in a deliverable condition when shipped, and if that is so, a presumption arises that the title passed on or before delivery to the carrier f. o. b. Wilmerding, subject again to the provisions of § 20. Section 20 deals with the reservation of the right of possession of, or the property in, goods shipped to the buyer. It makes the distinction that if the bill of lading is drawn to the order of the buyer or his agent, and is retained by the seller or his agent to secure payment of the price, the seller reserves only the right of possession of the goods; but if the bill of lading is drawn to the order of the seller or his agent, "the seller . . . reserves the property in the goods." This last statement is, however, qualified by the next succeeding words: "But if, except for the form of the bill of lading, the property would have passed to the buyer on the shipment of the goods, the seller's property in the goods shall be deemed to be only for the purpose of securing performance by the buyer of his obligations under the contract."

Manifestly, the intention is to make some kind of a distinction between a reservation of title with intent to remain the owner of the goods for all purposes, and

a reservation of title for the sole purpose of securing payment of the price. The legal effect of this distinction is pointed out in § 22: "Unless otherwise agreed, the goods remain at the seller's risk until the property therein is transferred to the buyer, . . . except that (a) where delivery of the goods has been made to the buyer, or to a bailee for the buyer, in pursuance of the contract, and the property in the goods has been retained by the seller merely to secure performance by the buyer of his obligations under the contract, the goods are at the buyer's risk from the time of such delivery." In this case the delivery of the goods to the carrier f. o. b. at Wilmerding was authorized by the buyer, and § 46 provides that "where, in pursuance of a contract to sell or a sale, the seller is authorized or required to send the goods to the buyer, delivery of the goods to a carrier, whether named by the buyer or not, for the purpose of transmission to the buyer, is deemed to be a delivery of the goods to the buyer, except in the cases provided for in Section 19, Rule 5 [where the seller contracts to deliver the goods to the buyer or at a certain place, etc.], or unless a contrary intent appears."

A delivery to a carrier in accordance with § 46 is a delivery to the buyer within the meaning of § 22, notwithstanding the fact that the buyer cannot have possession of the goods until the seller is paid, because the Sales Act contemplates that the seller may at his option reserve the *jus disponendi*.

It makes no difference to a buyer who has agreed to pay the freight, whether a sight draft is presented to him attached to a bill of lading drawn to his own order, or to a bill of lading drawn to the order of the seller and indorsed in blank. In either case he must pay his draft in order to get possession of the goods, and in either case his rights, on paying the draft, are the same.

The risk of loss unquestionably passes to the buyer in the former case, as soon as the goods are delivered to the carrier, and § 22 of the Sales Act provides that it shall pass to the buyer at the same time in the latter case, provided the seller's purpose in drawing the bill of lading to his own order was merely to secure payment of the draft. This resolves for us any conflict of opinion on the point, and gives to the maxim *res perit domino* an interpretation which makes the risk follow the beneficial interest according to the intent of the parties, and not the legal title held merely as security for the payment of the price. The court erred in charging the jury that because of the form of the bills of lading the risk of loss in transit rested upon the defendant.

The court correctly charged the jury that the letters f. o. b. indicated an agreement by the buyer to pay freight from the place named; and that the words "Terms sight draft on arrival at destination," did not in and of themselves operate to defer the vesting of title in the buyer, and did not in and of themselves express an agreement that the goods should not be paid for until delivered at New Haven, or an agreement to deliver them at New Haven. As already stated, evidence of the circumstances under which this phrase was adopted as one term of the contract was admissible in aid of its proper interpretation, and the same is true of any other term in Exhibit G.

Upon the evidence before it, the court did not err in admitting testimony as to the fact and amount of a shortage in the weight of the goods at New Haven, as compared with the weight called for by the bills of lading and the amount of the drafts. Assuming that this testimony tends to show only a loss in transit and not a deficiency in shipment, it may or may not be inadmissible on the new trial, according as the evidence may or may not conclusively show that the parties in-

tended the title to pass to the buyer at or before shipment.

Other assignments of error in charging or refusing to charge require no separate mention in view of the construction put upon the Sales Act.

There is error and a new trial is ordered.

In this opinion the other judges concurred.